23-19-93 Tameka N. Rayney v. The Retirement Board of the Policemen's Annuity & Benefit Fund of the City of Chicago Please keep your voices up. There are people all the way in the back and this microphone only records it. Whenever you are ready, counsel for the board. Good morning, justices. May it please the court, counsel. My name is Nomura Kansilla. I represent the Retirement Board for the Policemen's Annuity & Benefit Fund for the City of Chicago. I'm sorry, I'm having a difficult time hearing you because of the people behind me. I'll make sure to speak out loud. Thank you. Again, my name is Nomura Kansilla. I represent the Retirement Board. In this case, to get to what the issue is, what we really have are two significant issues in this case. First of all, did the Retirement Board, in their decision, or was the Retirement Board's decision against the manifest weight of the evidence when it decided that the plaintiff, the officer Tameka Rayney, was no longer disabled from two specific injuries? The second issue is whether or not the award or the granting of attorney's fees by the trial court was allowed. Regardless of what this court's decision is on that first issue about whether there was a manifest error committed by the pension board, regardless of this court's decision, the issue about the attorney's fees is significant and clear. Not only is the case law, but the statute and the arguments that we've presented clearly show that the attorney's fees should not have been granted in this case. Let's go back to that first issue. There'd be no reason we'd reach the attorney's fees if we were to reverse the circuit court. Correct. Let's focus on that first. Even if the court were to reverse the circuit court, or excuse me, to uphold the circuit court. I understand. Then you think we should reverse the manifest fees. I understand your position. Let's start with your position on the merits. Absolutely. Putting aside the evidence that was presented at the hearing, how do you get around Kazukas and the clear holding of our Supreme Court that disability benefits cannot be denied to someone who has not offered their job? Kazukas is, in this particular factual situation, inapplicable. The reason why is this. The police officer in this case was up for a status review. That status review starts from when she was found disabled initially, back in 2017. Every year she goes through a routine examination by a physician appointed by the board to examine to see whether or not she is in fact still disabled from those original injuries. And that's his, or her, task. Tell me about that process. So every year the officer has a wellness exam or an exam by a physician. Is there a new application that's filed in order to have benefits continued or to start that process? No. There is no application whatsoever. The benefits continue until there is, as Tarano points out in that case, which Kazukas relies on, Tarano points out when those benefits would potentially cease. For instance, felony forfeiture, a felony conviction. Or, as in this case, the person is no longer disabled from those particular injuries. And who initiates this process, this review? The review is done, it's statutorily mandated. And what happens is that the board, or their administration, indicates to the officer that he or she needs to respond to a particular location to be reexamined by their appointed physician. There's an appointment scheduled. There are procedures both in the rules and regulations that outline what the procedure is after that. So what happens is that that individual who is on duty disability, or any disability, comes in, is examined. Records can be reviewed. We've seen that. I believe records were reviewed in this case as well by Dr. Orris. And then what happens is that that physician then can make a recommendation. In this case, what happens is Dr. Orris said she appears to be disabled, or continues to be disabled, based on her right shoulder and her neck. But she also has, or seems to have, PTSD. And Dr. Orris points out, well, wait a minute. There's a problem, or I sense a problem, with her physical explanation of what's going on and the evidence that he is able to see, the corroboration, the physical examination. So if you'll see in Dr. Orris's report, he says he's suggesting that she submit to a more detailed independent medical examination, which is conducted in this case. Dr. Neal is the one that comes in and conducts that examination. So getting back to your point on kazookas, the reason why it doesn't apply here is specifically, in this case, Officer Rainey develops additional conditions and medical issues over the course of time. Those are not at all, pardon me, sufficiently tied into or tied into the original act of duty or duty disability, the events that occurred either in 2013 or 2015. Specifically, for example, PTSD. In this case, she is, there's evidence in the record by her own physicians that she has PTSD. Okay, let's assume that the evidence is sufficient for the board to say that. How do you get around kazookas? Because she's still in the same catch-22. She's not reinstated to her job, and she's not on disability. She's not even, the board did not, as they could have, put her on ordinary disability. She's on no disability. In this case, the reason why it's a problematic application of kazookas, why kazookas cannot apply, is because she develops other disabling things that aren't necessarily related to her position as a police officer. But she's in the same catch-22. So you want to carve an exception out of the kazookas. No. What the court would be suggesting, and I respectfully disagree, is that it's making kazookas even broader than what it really is. Because by the court's interpretation that kazookas would apply in this case, it would necessarily include any disability that develops after the fact. Once you're on, in other words, once an officer is on disability, they are perpetually on disability regardless of the cause. And that kazookas can clearly never contemplated that and could not consider that. Let me ask you why you didn't mention kazookas in your opening brief. When the entire second court decision is based on kazookas, where it's clear what this court is going to consider as kazookas, and you don't mention it in your opening brief. My, our position was, is that kazookas is inapplicable. Okay, then make that argument. Which we did in our, in our. In my brief for the first time. In your opening brief there's no mention of it. That is correct. That's. Because what we have is we have a. So I would say you can't talk about kazookas. I could say that. Because you're supposed to mention it, you're supposed to address it in your opening brief. But we're responding to what the. But the circuit court's entire decision is based on kazookas. And there are fundamental problems with the circuit court's decision from the get-go. All right. Okay. I will listen to you. But I'm not sure I will allow you to proceed on this in the merits of this decision. Because you really have forfeited it. Because you did not address it in your opening brief. And I, I'm saying this so you can respond to it. Thank you. Because I view it as a forfeiture. The position that was, was that this is not applicable. And again, and I'm, I'm, I'm arguing circularly. Circularly, pardon me. In this, in this matter. The issue comes down to is kazookas deals with someone who is on disability. Which she was.  Well, she was not, it was not a status case. This was, excuse me, it was a status case. Just like this case. Correct. And, but what happened is that in this case, clearly every physician says that she is disabled. No one says that she can go back to work. Okay. The police department has said that, that Ms. Rady cannot go back to work either. Very carefully. If you look at the decision in order, specifically, the order says that what happened is that, what the board is finding is that those two injuries, to the neck and to the right shoulder, are no longer disabling. Specifically, on C-64, what they do is they write, excuse me, on C-64, they initially wrote that she received her disability benefits based on the injury to her neck and to her shoulder. And that those are no longer, that one physician, the board physician, said those are no longer disabling. Correct. I understand. But then the board continues to conclude and says that she has other unrelated disabling conditions. And that she is not, she cannot go back. So if you look at Dr. Neal's opinion, for example. Okay, but I understand. But then what's supposed to happen? Is it okay to then put her in a catch-22 where she has no income coming in? It's not a catch-22. Part of this is it's not completely dependent on the board. The plaintiff or the officer has a responsibility to come back to the board along the way. For instance, on this PTSD issue, which the police department found to be apparently the most concerning issue that they have about not rehiring her. She needs to come back and say, listen, I've developed this PTSD. I need to reconfigure my, you know, you need to adjust it related to this new diagnosis. The board didn't have the authority to do that on its own. It offered her an ordinary disability. Couldn't it have done that on its own? The board? They offered her. Yes. So they could have just said, we find that your disability is no longer work-related. We're going to convert it to a non-duty disability. And I think the record reflects what the board had suggested. They said, we offer you that but only if you waive your right to pursue a duty disability. Correct. So they could have just offered it to her. They could have done a number of things in the case. But what we have before us is where they conducted their examination, they conducted an analysis of the evidence, and their conclusion was that these two injuries are no longer disabled. And that's it. No, but also that she remains disabled. But it's not no longer duty disabled. Correct. So that was their conclusion. Well, this is the issue. It's unclear whether it is or is not a duty disability. A PTSD, just from a layperson's examination, can occur. It could be a duty disability. It could be. But there's no evidence. This is the problem. The plaintiff, the officer, would have and can have the opportunity to come in and reapply and say, this is my duty disability now. It's no longer my shoulder or it's in addition to my shoulder and to my neck. It is now this. And the board would then have to address it. No application was ever filed by her except back in 2016 when she was granted her duty disability. No other work was done. And what this also brings to mind or what should bring to the court's attention is this, is that looking at the sequence of events before the pension board in 2022. So she gets examined in 2021. They send a notice saying that there's going to be a hearing. In 2022 at large, she appears and she asks for a continuance because she would like to get an attorney. They give her that opportunity. In the meantime, she then goes and starts seeing physicians because she hadn't seen physicians for about two years regarding these issues. She then comes in in June, has reports, but failed to get those reports to the board within a year. And you capture that immediately. We weren't aware of the record. So then what happens is if you look at the record that was developed on this case, what's clear is that she was not treated for any of these disabilities or issues or medical conditions for a rather substantial period of time, for two to three years. And what she has is she brings through the sort of parade of horribles that she has. She says that she's got the issue with the cervix or the neck. That, however, according to Dr. Lim, is a degenerative disease. Dr. Redondo, about this right knee issue that she brings in is saying, this is one of my disabilities, my right knee. Dr. Redondo says, or the examination that's conducted, shows that it's not a tear. It's not damage due to trauma. It is a degenerative disease. And I'm going to butcher it, and I apologize. I'm clearly not a trained physician. It's the crumb drill malacia. That is a degenerative disease. It's not a traumatic result. So are you suggesting that because they're degenerative that they probably would have occurred anyway without the accidents? They may have, but there's no evidence presented. And Dr. Neal doesn't agree. According to Dr. Neal, who's the physician that conducts the two subsequent IMEs, 21 and 22, there's no connection between these issues or these conditions with those accidents, except for the self-reporting of officer rating. So what you have is you have an individual who is receiving a benefit that is the only one that's connecting that benefit or the results of the accident to her current conditions. It's problematic. There isn't sufficient evidence, I think, that you can say that these are, in fact, caused by the injury, caused by the accident, or they were not caused by the accident. But there was initially evidence that she had injuries to these parts of her body after the initial accident, correct? Correct. But just because you injure a part of her body doesn't mean that the later apparent or believed to be disabling condition is related to it. There's a difference between correlation and causation. And that difference was not specifically addressed by anything presented by the police officer. Well, the police officer asked for a continuance to get counsel and was denied by the board. So she was self-represented at the board hearing, correct? Well, she was given three opportunities to appear with counsel. I understand. But ultimately, the day that the hearing went forward, she asked for a continuance. Right. And she was self-represented. She was self-represented, although there is indication that she was in contact with counsel Akari prior to that, at least prior to that August 25th, which was the hearing date. You have not too much time left if you want to address fees, unless somebody else has a question about it. To address the fees very quickly, I don't know if this is appropriate to say, beaten the horse on this pretty solidly. The statute is very clear. The court's ruling, and it's, I would just, the court's ruling, the trial court's ruling back on May 15th of 2024, was specifically, he states, the language is unambiguous. The court does not need extrinsic aides to construe the meaning of the statute. Also, the court is not convinced that the award of attorney's fees is inappropriate, due to Rainey seeking to retain her benefits rather than applying for them outright and being denied. The court finds that such a narrow construction of the statute is not the legislator's intention, nor can the court read such prohibitive language into the statute. Well, let's look at the statute. If any policeman whose application for a duty disability has been denied, and they have an action for administrative abuse. So it's, I guess, a question, going back to Justice Johnson's question, does the officer continue to have the burden of showing their entitlement to benefits year after year? So, the statute's completely unclear as to who has the burden on these issues. The board takes the position that the applicant continues to have the burden. Correct. Okay. But she's not applying. I understand, but it's a continuation. It's a continuation. And so, specifically, in addition, there's a requirement of, you know, as the appellate court has specifically addressed in Kaniarski and in Warner, this appellate court has specifically found that status cases do not involve the application of 228 sub B in getting the fees. So they're both Rule 23 orders. They are. They are Rule 23. And we're not caught by them anyway. Absolutely. But they're well-reasoned. Are they reasoned? I mean, the language I understand. But I suppose the question is, does she remain an applicant? Does she remain an applicant? And to me, that's partly dependent on who has the burden. And your position is, she continues to have the burden. Your position the board has taken, I think it might even be in your rules, that the board, that the applicant has the burden year after year. So there is, under the statute, the applicant needs to be examined. And if the applicant fails to be examined, i.e., ignores the appointments, does not respond, does not contribute to the process, then the board can summarily stop the payments. That's what the application would be. Right. Correct. But there is no application here. I mean, that is clear. Kelly, the published case regarding a PTSD issue, in that case, Kelly was very specific. That was not a status case. But Kelly, in addressing the fees issue, was very specific in saying that it has to do with an application. It doesn't have to do with any other portion of the process. It is an application for duty disability under 154 or occupational under 154.1. So, in this case, this is not an application under 154, duty disability, or 154.1, occupational disability. This is a status review under 156. Because the legislature specifically 156 applies to the application, initial application as well. Correct. That was the whole statute we just talked about in the last motion. But if you look at the statute, the statute doesn't say application under 156. It says application under 154 or 154.1. It doesn't say anything about 156. The principle, and I've forgotten my Latin, the inclusion of one is the exclusion of the other. The specific inclusion of 154 and 154.1, and the exclusion of 156 would indicate that, clearly that it was not intended, the statute, particularly the fee-shifting statute, was not intended to apply to the situations like this, the status. Further, I will point out, and the legislature tried to pass legislation this year addressing specifically faxed patterns like this, where there is an application, excuse me, where there is an application for any benefit, or there is a status review. That did not pass. Clearly, the legislature feels that there is, that the statute doesn't cover these situations either, for what it's worth. Or it could have just decided the statute's unnecessary because it already covered it. I don't know. Maybe. We never know what the legislature is thinking. Absolutely. So that particular statute was brought into, was pushed back into assignments, where I've been told that's where bills were to die. So, thank you. We'll hear from you again. Thank you. May it please the Court, Counsel Ralph Ficarri on behalf of the plaintiff, Tamika Rainey. Before I go into my case, I want to touch briefly on a few items that Mr. Pinsella just told the Court, the last one being that the legislation failed. And that couldn't be farther from the truth. I just this morning, or I'm sorry, last evening, printed out the status of the legislation. On April 19th of 24, it was passed by the House 107 to 0. It's currently in the Senate waiting for a vote. So it did not fail. This Counsel just told this Court, and he could have saw that if he would have researched the Internet. It's still not applicable to this case. I agree, but I just want to point out that what he said is not correct. It's important. Counsel also said that after she was denied disability, she could have came back to the Board and asked for it. Well, she did. If you look at the record, page 387 of the record, that's the motion to reconsider. I represented Ms. Rainey in both her initial case and this case. After she was denied disability, she went back to the city to try to get her job back. Denied. I then filed a motion to reconsider and attached all the exhibits. So she did come back to the Board, and she was denied a second time. This is a tough case. Officer Rainey almost died in a rollover car accident at 70 miles an hour. And I followed her through to this case. When you say she applied, what specifically did she apply for? Duty, disability, benefit, to get her benefits reinstated. Any type of benefit, actually. Okay. Is it called original, the 50%? Well, we just asked that her benefits be reinstated. So the relief I asked for, and it's page, we asked for 75% in continued duty benefits, retroactive. And that's page 389 of the common law record. And that's the motion I filed. After she was denied a disability, and after she went back to the city, and they denied her reinstatement. And then that's when Kazuka's case would apply. Did she ever specifically apply for the disability benefit that was non-duty, the 50%? No. There's not an opportunity because the statute requires, after a board denies you a disability, to file an admin review within 35 days, otherwise you're forever barred. And I don't believe the Pension Board could do a claim or an application for an ordinary disability while there's a pending petition in the circuit court for administrative review. So you can't have two different disability applications. So you do ordinary versus original. Correct. So she had to do it within 35 days. Okay. So the issues in this case are not very complex. And just to be clear on the timing, you did not represent her at the hearing itself. You weren't present at the hearing. At the original hearing when she was awarded 75, correct. And your written motion to reconsider on her behalf was filed before the board issued its written decision. Yes, correct. So it had already verbally told her to. Correct. I filed it the day that the written decision was supposed to be entered.  Because what happens is, and I've done about 380 of these cases. I pretty much do almost all of them. The board will issue an oral decision, and a month later, Mr. Pinsella's firm or Mr. Pennelly's firm will issue a written decision a month later. And that's when the 35 days triggers for administrative review. So the issues, I think, in this case are clear. Is Officer Rainey still disabled? And if so, is the cause of her disability the traffic crashes which occurred in 13 and 15, in which she was awarded 75, or was there some other cause? And is Officer Rainey entitled to attorney's fees pursuant to 5228B? Well, let's say it's the second one. It's some other cause. So there's evidence to support the board's view that it was some other cause at this point.  Then what? What are we supposed to do? What should the board have done? The board should have awarded her an ordinary disability. In fact, and that's what I'm going to touch on in my argument. So the first question is, is Officer Rainey disabled? Well, she was not cleared for duty by Dr. Kristen Hausen-Klotz, or Bach, I can't pronounce her name, at Concentra Hospital. And that's pages 25 and 26 of the record. Multiple musculoskeletal injuries, scheduled for surgery, unable to work for orthopedic specialties, PTSD, unable to return to police duties. And there's a myriad of different medical terms in here. All of which takes you back to Kizugis. No matter what the board doctors say, she's not cleared for duty. So she's disabled under the statutory language in Kizugis. That's correct. And then the city of Chicago denied her. And that's page 28 of the board's common law record. Now, this is the part that really should alarm the court. Prior to the hearing on August 25, 2022, the president of the board, Lieutenant Michael Stesak, made an offer to my client and said, duty disability is off the table. Even before a vote was entered, he took it off the table, which I don't think he has the authority, but said, we'll offer you ordinary disability. That should be a red flag, and here's why. We all know that the pension fund is a public fund, and that the trustees on the board are fiduciaries. No one on the board has the authority to give a claimant a disability unless they are, in fact, disabled under the statute. Section 5.115 of the statute says, disability is a condition of physical or mental incapacity to perform any assigned duty or duties. Under the offer, she was offered ordinary, which also requires you to be disabled. So how can this board ethically say, she's not disabled, and when they offered her a disability as a fiduciary, they can't do that. This is not an insurance case where Magister offers you some nuisance money to settle the case. We're dealing with a public pension fund. And what did they do? She didn't accept their offer. And what did they do? They punished her, just like they punished the other officer and the other officers. They took her benefits away, and she's been without pay for about three years now because she didn't accept their offer. Because clearly, she was disabled, and they knew it. They know she can't go back to work. So what did they do? Because she didn't take their offer, they took her disability benefits and put her in a no-pay status, her and her family, for the last three years with no income. Now, the board, once again, completely misstates the facts in this case. And if you look at pages 4 and 5 of the board's reply brief, plaintiff in this case has substantially failed to provide any support for a claim of continued disability, but has instead posited new potential disabilities such as PTSD, So what the board is saying is she has all these new injuries that weren't present from the original IOD. Well, how do we know that's false? Well, we know that by looking at the original IME, which she was awarded disability in 2017. Prior to the award of her disability in 2017, the officer had IMEs on the request of the board, two of them. One is dated June of 16, and one is dated July of 16. Those are pages 173 to 196. Those were used by the board to award her a 75% benefit, which was issued on January 26 of 17. When you look at these IMEs, the IMEs identify the injuries she sustained from the motor vehicle crashes. And remarkably, the injuries that this board has said she posited are new injuries that didn't exist miraculously appear on the IME report. For example, on page 176, Page 177 of that same IME that was in 2016, So you're saying the same injuries that are showing up at the time they discontinued benefits were the injuries that showed up? Yes. If I had three hours' time, I could go over this. The records are over 1,000 pages. But more importantly, this degeneration was present in the IME. And also, municipal injuries to both knees, MRI to the hand showing inter-carpal effusions. So all the injuries that this board is saying weren't present, including PTSD. If you look at the records, the PTSD was diagnosed shortly after the accident. Now, on the day of the hearing, Officer Rainey was treated by eight different doctors.  And I summarized all the doctors in our brief. Dr. Kusama, page 211, diagnosed Officer Rainey with L5-S1 disc degeneration with radiculopathy. On April and August of 22, Dr. Lim, a board-certified orthopedic surgeon, found that Officer Rainey is disabled for cervical and lumbar problems. The onset date, page 641, is 2-13-13. Counsel, how do you reconcile opposing counsel's position that he really only needs one doctor to say that she's no longer disabled? The Kazookas case. And the Kazookas case says, even if their doctor disagrees, if the city of Chicago will not give the officer her job back, they can't put her in a catch-22 situation, and therefore they must leave her on disability. Secondly, their own doctor says she's disabled, but they said she's disabled from other conditions not related to the IOD. So she's clearly disabled. As I said earlier, Lieutenant Ciesek, the president of the board, offered her disability. The only question is, what injuries caused the disablement? Were they the original IOD, or are they new injuries? We also have Dr. Lim talking about radiculopathy, a 10-year history of injuries. I can go on and on. Following up on your answer to Justice Johnson's question, why would it not be all right under Kazookas if the board finds, yes, she is still disabled. She may still be disabled, but it's not duty-related. I agree. It's a new cause, and the burden is on her to make a new application. What's wrong with that? Well, I agree. Kazookas doesn't dictate the type of disability. However, what they should have done at the hearing was granted her an order, because as I said earlier, she can't apply unless she has a pending action for administrative review. What the board should have done was just converted it, if they thought it was a new injury, because she's clearly disabled. Perhaps once they deny, then that would have triggered her going to apply for the… Well, as I said earlier, she couldn't apply because she had a pending petition for administrative review, which is asking for duty. So if she applied for ordinary, the board's going to say, we can't award you ordinary if you have an application or a lawsuit, and I've had this exact case. It actually was in court before Judge Riley. So if you have a pending administrative review, you can't apply for another benefit, because you can't get two different benefits. So what the board should have done, if they believe these are new injuries, went with their offer and gave her an ordinary. But instead, they punished her, because their own doctor says she's disabled, but for other reasons. So why would they not have converted it? And what they did is they gave her a letter, and this is important to note, too. It's page 23, and it tells her that she should go apply for her job back. This is what they told her after they denied her benefit. So they told her what to do, and she did what they told her. And after she did what they told her, she was denied, she went back, and they still denied her a benefit. So she followed the administrative review in this case. Can you address the attorney's fee issue counsel? Yes. So I believe, and once again, this statute, I wrote the bill that hopefully will be in law shortly. The proposal that counsel referred to? Yes, yes. Okay. So I believe these are new applications, because what happened is when she went before the board for a hearing, her benefits were terminated. They hid. Without a hearing, stop your benefits. So when she went before the board, this is the same as a new application. She went before the board as an officer without a benefit, saying, give me my benefits. No different than an application, and that's what the court in the lower court addressed. So, but that was simply the timing, and that was punishment because she wasn't ready at the first date. They wanted to have a hearing, so they're like, we're cutting off your benefits. So in that case, she's coming as an officer without benefits, but if she'd been ready for that first hearing, she would have come as an officer with benefits. I agree. It's a tough case. However, I believe that every year these officers have to continue. The board acknowledges it's her burden to prove her continued disability, so she has to reapply, not on a piece of paper, but reapply when she goes for a hearing. So she's redoing this application by telling the board, I'm still disabled, and I think the case law is against the board on this, but that's what the board's position is, and they admit it in their brief. I understand it's not exactly what the statute, it's an interpretation, and I think the lower court correctly interpreted it. I believe fees are appropriate, especially in this case, where this officer should not have been denied at least an ordinary benefit. Clearly, these injuries, and I think the record could be clearer, existed from the IOD. Dr. Redondo, ages 253 and 259, bilateral traumatic brain injuries dating back to 2013. This is a note from 22, right before the hearing. MRI scan, May of 22. Dr. Mayakar, right wrist tear degenerative. Dr. Muttley. Okay, you're just about out of time. Nothing we don't love here in medical terms, but you have about two minutes left. Sure. So, I mean, if you look at the record in my brief, it talks about what all the doctors opined in 22, right before the hearing, and related those injuries back to the IOD. So when CONSA says these are new injuries, the medical records that were existent at the time and kept in the ordinary course of business, and also were stipulated and admitted to by the board, that's important. The board admitted these records without objection. So there's no foundation problems or anything. These records are admitted by the board, and those records speak for themselves. They clearly show that the officers' injuries dated back to the IOD. Thank you. I appreciate your time. Sure. Hopefully, I'll be brief. Justices, first of all, just to go back to the first point that counsel brought up, hot off the presses, specific entry on May 17th for that House bill. It is in the Senate, but it was pushed back to the assignments.  It's not a law. Right, it doesn't matter. So counsel makes out a whole cloth, this prohibition, that his client couldn't have applied for a new disability pension or modified her disability pension. There is no requirement to say that if you have a denial of a disability, you can't re-litigate those issues on the denial of disability, right? You can't start a new administrative proceeding. Agreed. But this isn't what this case is. This case is the status. Is she continuing to be disabled? Is she continuing to suffer a disability on the two injuries? That's the issue before the circuit court, and that's the issue before this court. Whether she has additional disabilities is a completely different issue, not specifically addressed or covered by that litigation. But that would suggest that she would be able to collect under both if she were awarded under both applications, the continuance and the new ordinary disability. That I can't address whether if you are disabled from a separate... Well, your example that you just gave, you said this is completely, this is a new application. Correct, but you can't go in and say, I've got a disability for this, and then I'm going to collect 2X when I develop a new disability completely unrelated. And that's what counsel is saying she would be accused of doing is she tried to apply for an ordinary disability while her appeal on the denial of her duty disability... Why does the court offer her an ordinary disability and then end up awarding that? I think the... Specifically in the record, I was not present so I can't address and I can't get into the minds of the bench and board. And that obviously is not part of the record. Looking at it, it appeared to... There was an offer of, I believe, the attorney or the hearing officer expressed that to her, that there was an offer of if you wish to take an ordinary disability, it would be with prejudice at this time. And that was offered, and she refused, she didn't take it. So, I don't... The... I get... I'm not answering your question by looking at the expression on your face. So, if you could just repeat the question again and just let me... I apologize. Why would the board offer an ordinary disability, and it was with prejudice to the duty disability claim, but then when she turned that down, award her nothing? That I can't answer. That's what the board did. We're left with the record that they've provided. It appears that they decided that the issue that they were going to address was not the other potential disabilities. The issue specifically that was addressed in the findings by the pension board was, is this officer still disabled related to the two specific injuries? And the... I believe the interpretation could be made looking at what they... the way that the decision and order was created or generated and signed off on, was that that was the sole issue that they were dealing with. They weren't dealing with... because there was no other substantive application for an ordinary disability or a different disability. So, but once they answered that question in the negative, section 5156 says, when the disability ceases, the board shall discontinue payment of benefits, which is what you did, and the policeman shall be returned to active service. So, maybe she's not returned to a beat, but maybe she's returned to desk duty or something. But I think the problem is that her disabilities don't allow her to even be in a light-duty position because theoretically... We don't know because there's no substantial evidence before the hearing board about what these disabilities actually are and what they're caused by. Yeah, but it's so shabby. No, by the one doctor hired by the pension board. Right, but there's plenty of medical evidence. Pardon me. Because the question your doctor was looking at was not that. Correct. So, and there was... There's the evidence that she... It's a conclusion that she has PTSD. There's no... The background evidence that you would need to verify that someone's got a diagnosis isn't contained in the record. That's what I'm suggesting. Two quick questions. One is, do you have a case or a site or a statute that says what you just said, which I have to say, based on Justice Johnson's question, sounds wrong to us, that she can go ahead, appeal the denial of her duty disability and apply with a brand-new application for ordinary disability and she will not be guilty of double-dipping in some way? Do you have a case, a statute, anything that says that that's fine? I do not, but I would clarify your point. It's not a denial of her application for duty disability. Just so... She's appealing your denial, her revocation... Which I think is a categorical difference. She's appealing your revocation for duty disability, which she has every right to do, and can she go ahead and apply for duty disability knowing that the appellate court could well reverse you under duty disability and could she go ahead and apply for ordinary disability and not be guilty of double-dipping or attempting to double-dip? I think what would happen, my... I don't want your opinion, I want a case or a statute that says that's okay. There is no, but there's no bar to that. There is a bar to double-dipping. Well, there's no case where an applicant has done that, that I'm aware of, so... Now I want your opinion. Do you think that's fine? What would happen is that if there is an appeal pending or there is something pending, or at least an administrative review, the attorney or the litigant can go in and ask for a stay of that litigation if they chose to. No, she wants to appeal the denial. She thinks it's wrong. But she also wants, just in case, so her kids get food, to get ordinary disability. Can she do that? Simply because she desires to pursue that appeal doesn't mean that she's excused from following through with putting the question before the hearing board, before the administrative board, the actual question. I would point out, you know, counsel indicated that he submitted these things, you know, that the records and what have you. It was after the ruling was made, and it was on August 25th. He submitted them on October 17th, and as the court is well aware, the opinion was, or excuse me, the decision was issued on October 25th. When that was actually, it wasn't addressed by the board. The board specifically did not address any of the things that were submitted by counsel Akari at the time of their decision. There was no motion to reconsider. As you know, in our opinion, there's no such thing, or according to the statute, the rules and regulations, there is no motion to reconsider before the hearing board. So all of the things that he said that were presented, they were, in effect, delivered to the board, but the board did not address them. Okay. Your point is? Just to clarify, that position is that counsel, go ahead. If you want to. I want to ask a really quick question. On page 25 of your brief, you said, accordingly, this court should affirm the pension board's termination of line-of-duty disability benefits, grant of ordinary disability benefits, and reverse the judgment of the circuit court. So somebody, whoever wrote this brief, seems to assume that the board actually awarded ordinary disability benefits. Could I have that? I'm sorry. Page 25 of your opening brief. I can show you mine. I'm sorry. At the very bottom. I wrote the brief, and that's an error on my part. So did you think at that moment that you had granted ordinary disability benefits?  That's an error. You should have granted ordinary disability benefits? I would draw that question. Counsel, I've asked that you address the plaintiff's contention that the alleged new injuries, particularly the, I guess, PTSD and some other big medical terms that he mentioned, existed in the original, what are the reports, the IMF or? The IMEs. IMEs, yes. I think, so, she went through two accidents. So we have an accident in 2013 and an accident in 2015. She was, she did suffer some injuries in 2013. What's important to keep in mind is that after a year of rehabilitation, she went back on the force, full duty, unrestricted. So those injuries are not debilitating by logical extension because she is no longer prevented from doing the activity, performing her responsibilities as a police officer if she is back at work. When that second injury or that second accident occurs in 2015, she doesn't, the injuries that are disabling, again, we have a universe of injuries that occur, but there are only two that are actually the disabling ones, that being the cervical, the neck, and the shoulder. Those are the ones that everyone seems to focus on, all the doctors. That's what Dr. Khanna focuses on on the original IME back in 2016. That's what Dr. Orris focuses on, and that's what Dr. Neal focuses on, is those two injuries. They do point to other injuries, but those injuries are not disabling. Plaintiff is saying that they are, in fact, disabling, and they have been disabling from the get-go, but that's not what any of the physicians found. I don't know if that answers your question. It seems that what the argument is, what I would suggest is that looking at the record, the record indicates that it is a parade of injuries that she points to as being disabling when those parade of injuries are not, in fact, disabling. There are two that were disabling. There's a development of PTSD or some other biopsychosocial issue that Dr. Neal points to that are different than what was there back in 2016, and the pension board was not afforded, in a sense, the opportunity to investigate all that because of their doctor's focus on those two injuries that were the original causes of the disability. Thank you. Thank you. Anything else? No. Anything else? Thank you, Justice. No. Thank you. Can I have 30 seconds? No. Can he have 30 seconds? No. The panel says no. Thank you, gentlemen. We will take this matter under advisement.